CAULK v. CARLSON.

No. 3924.   Opinion Filed December 22, 1914.

(145 Pac. 335.)

1.   EVIDENCE—Finding—Value.   Evidence by a witness that a span of horses is worth "in the neighborhood of $300.00" and of the owner that he would not sell them at all, and would not take, if he had to sell them, less than $375 or $400, is not sufficient to support a finding that the actual value is $400, and when coupled with other errors will require a reversal.

2.   PAYMENT—Proof—Possession of Note—Instructions.   Possession of promissory note, after maturity, is ordinarily prima facie evidence of payment; but a naked statement to this effect in an instruction to a jury is not a sufficient charge, where the main controversy regards the manner of obtaining possession, that is, whether fraudulent or not.

(Syllabus by Brewer, C.)

*Error from County Court, Caddo County;
C. Ross Hume, Judge.*

Action by H. F. Caulk against E. W. Carlson.   Judgment for defendant, and plaintiff brings error.   Reversed, and new trial ordered.

*A. J. Morris,* for plaintiff in error.

*H. W. Morgan,* for defendant in error.

Opinion by BREWER, C.   The plaintiff in error, Caulk, brought this suit in replevin for possession of a span of horses,

alleging a special ownership in the property and a right to possession thereof because of the terms of a chattel mortgage describing the property, and which was given to secure the payment of a promissory note for $162.50, which it was alleged had not been paid when due, the same being a breach of the conditions of the mortgage. Several amendments were made to both the petition and the answer, which it is not necessary to particularize. The plaintiff alleged that the note underlying the mortgage had been lost by him and could not be found after diligent efforts so to do. The defense was that of payment. At a trial had, by agreement, before a jury of five men, four of the jurors signed and returned a verdict in favor of the defendant in the sum of $400 as the value of the team and $100 damages. An original motion and later a supplemental motion for a new trial were filed, setting up many grounds, including that of newly discovered evidence. These motions were later overruled by the court and exceptions allowed, from which the plaintiff appeals by case-made properly certified.

From the brief statement made above it would appear that but slight difficulty would be encountered in reviewing this case; but because of the numerous amended pleadings filed, and the wide and peculiar range the evidence took, we have found considerable difficulty in following the proceedings below, which resulted as we have stated; and, without going into the very numerous points urged for a reversal in detail, a study of the case has convinced us that it ought to be reversed for the following reasons: First. The evidence does not sufficiently support the amount awarded as to the value of the horses. The defendant undertakes to show that it is sufficient, but we cannot agree with the view taken. The only evidence he relies on in the brief is the testimony of a witness who answers, "A. They were worth something in the neighborhood of $300," coupled with the answer of the defendant himself, who answered thus: "A. I would not sell it for no money. If I had to sell them, if

I was bound to sell them, I would take no less than $400 or $375." On this testimony alone ·the defendant was awarded judgment for $400 as the actual value of the two horses. While great latitude is allowed in placing value on this class of property, and it has been often held that an intelligent, well-informed farmer may give his opinion as to the value of animals of this character, in the community, without a strict qualification as an expert on values, yet, when you read the evidence above set forth, it appears· the only real testimony as to value is that the horses were worth "in the neighborhood of $300."· The defendant, it is true, says he "would not take less than $400 or $375," but this is a very different thing from saying that they were actually worth that sum of money. He nowhere says what their value was. If this was all the trouble. presented in the case, we might attempt to adjust the matter by a *remittitur*, but it is not. The defense of payment as shown by the record was weak, and the instruction on this ·phase of the case was misleading, because of the peculiar situation developed by the evidence. To make what we mean clear, we will state what the defense of payment was predicated upon. At the time the note in suit was executed, the defendant had certain dealings with one Meeks, by which he bought from Meeks his claim on a quarter section of school land for the consideration of $550, of which he paid one-half in cash and executed his note, with some kind of a lien, for $275, the balance due on the land. At the same time the defendant bought the horses in question from Meeks for a consideration of $325, paying one-half cash and giving his note for the balance, secured·by a chattel mortgage on the horses. This is the note and mortgage involved here. This last note was sold by Meeks to the plaintiff, and transferred by written in-·dorsement, immediately after its execution. It was to run for one year. The defendant knew that plaintiff had acquired the ownership of the note.

As we understand defendant's evidence, he claims that, after he bought the school land from Meeks, a question arose about a

string of fence on it, which he had heard was being claimed by the plaintiff. So the defendant claims that he complained to Meeks about this fact of the fence, and that to make it right with him, Meeks surrendered the note for $275, representing one-half of the original purchase price of the land, and also agreed to surrender and cancel the note for $162.50, which had been assigned to the plaintiff, and that Meeks had surrendered the larger note about February 5, 1910, and that later, about March 8th or 9th, a week or two before this suit was brought, Meeks brought the note involved here over to defendant, and delivered it to him, and that in that way he had paid it, although he does not deny that he knew that the plaintiff was claming to be the owner of the note. In other words, defendant's contention amounts to this: That the man Meeks had compromised the fence matter with him by turning over the two notes as fully satisfied, in settlement of the fence dispute, the two notes amounting, with interest, to at least $450. As we understand it, the undisputed evidence shows that this piece of fence, made the basis for the claim of settlement, was worth between $20 and $30. It is further shown that the plaintiff made no claim to the fence, had never attempted to take it from the defendant, and that the defendant still had and was using it at the time of trial. As we understand the evidence, which we have examined with some care, this substantially states the basis of the claim of payment. But the thing that caused the trouble in the case was the fact that when the defendant went on the witness stand, he had in his possession the note in controversy, and which the plaintiff alleged in his pleading had become lost. When the note was produced by the defendant the issue then became very sharply defined on the question of how he came in possession of it. It may be here mentioned, and there appears to be no controversy over it, that Meeks did surrender to the defendant the $275 note, and the defendant had it in his possession; but that the surrender was made at the time the obligation was renewed by the giving of a new note and lien. The plaintiff

and Meeks both testified that after the note involved here was due, and on March 15, 1911, they went to the home of the defendant for the purpose of allowing him to renew it by giving a new note and mortgage. The plaintiff says that he took defendant's note with him, and had it there in defendant's home, with other papers, in discussing the giving of new papers by which the time of payment would be extended; that the defendant declined to give new papers, although making no claim that he had paid the note at the time, explaining privately that his wife was opposed to his signing the papers, but that he would come into town in a few days and fix them up. The plaintiff and Meeks left defendant's home, without a renewal, and as soon as plaintiff got back to his own home he discovered that he had lost the note which he had gone to defendant's to have renewed; so the plaintiff went back to the defendant's house that same day, and told defendant that he had left the note, his bank book, and some other papers on defendant's center table, and asked him if he had found them, which defendant denied; that defendant made no claim that he had the note, or had paid it off, or in any way came into possession of it. Both plaintiff and Meeks testified that plaintiff had the note with him at defendant's home on that visit, March 15, 1911. The defendant claims that on March 7th or 8th, just before plaintiff's visit, Meeks had delivered the note to him out in the woods, where he and his son were at work, in compliance with a previous promise to do so, made when he delivered the land note; that he had the note in his possession when plaintiff and Meeks were in his home, to get him to execute new papers. And he claimed that the note had been paid, as hereinbefore stated, in settling the fence dispute.

The court instructed the jury, in substance, that if they believed from the evidence that the defendant was in possession and control of the note before the commencement of the action, such possession was presumptive evidence of ownership, and that unless they found from the evidence that the plaintiff

owned the note, the presumption would be that it really belonged to the defendant. This instruction, as an abstract proposition, and in so far as it states any rule of law at all, is perhaps correct; but it was wholly insufficient under the peculiar situation presented, and we have no doubt that the jury was misled into attaching undue importance to the fact that defendant had the note in his possession. The crux of the matter was as to how he came into possession of the note, coupled with the facts in evidence as regards its payment. If plaintiff's evidence was true that he had the note with him at defendant's home and left it inadvertently with other papers on the table, defendant found it there, his possession would be fraudulent and amount to nothing; and if defendant even came into possession of the note in the manner in which he claims, the fact of whether or not he had paid it, and was entitled to have so received it, would depend upon the evidence he offered, relative to its payment. This point was the controlling one in the case, and was doubtless the deciding one with the jury, and, being such, the law applicable to these facts should have been much more clearly stated to them. It is true that possession by the maker of a promissory note, of itself and standing alone, is *prima facie* evidence of payment. 30 Cyc. 1268, note (d), and cases cited. But this case did not rest upon the naked question of possession, but upon evidence from both sides, not disputing the possession, but explaining how it came about. We are satisfied that, for want of adequate instruction as to the law applicable to the peculiar situation presented, the jury attached far more importance to the possession of this note than it would have done under proper instructions.

As this case must be tried again, we shall refrain from commenting in detail upon the evidence presented.

Third. There is another point raised in the motion for a new trial, which of itself perhaps insufficient to require a reversal, would, under the peculiar circumstances of the case, in our judgment, have justified the granting of a new trial.

Plaintiff claimed that he was utterly without any information of defendant's possession of the note, until it was produced in the trial, under a plea of payment, and that, therefore, he had not anticipated, and was not called upon to anticipate, that he would have to meet this issue, so he set up in his motion for a new trial the fact that his sister kept in her possession his notes and papers, and that she would testify, if granted a new trial, that she had had in her possession for plaintiff the note in question, since it was transferred to him, and that she delivered it to the plaintiff on March 15th, when he went down with Meeks to the defendant's to have it renewed. If this was true, and it is supported by her affidavit, it could not be true that defendant obtained the possession of the note, as he claimed, seven or eight days before plaintiff was at his house, seeking to have it renewed; and this evidence, coming from a witness with less interest, presumably, than had the other parties who testified, of itself, would probably have changed the result, and, taken together with a fuller and better instruction of the law applicable, it seems more certain that it would have changed the result, so it is clear to us the ends of justice require a retrial of the whole controversy; and we conclude, for the reasons given, that the case should be reversed and a new trial ordered.

By the Court: It is so ordered.